William DIONNE, Plaintiff–Appellant,

v.

MAYOR AND CITY COUNCIL OF BALTIMORE; Joyce Jefferson–Daniels, Defendants–Appellees.

No. 93–1042.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 30, 1993.

Decided Nov. 22, 1994.

---

**ARGUED:** Kathleen M. Cahill, Baltimore, MD, for appellant. Laurice Deanne Royal, Baltimore, MD, for appellees. **ON BRIEF:** Jeanne–Marie Bates, Baltimore, MD, for appellant. Otho M. Thompson, Baltimore, MD, for appellees.

Before WIDENER and WILLIAMS, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Vacated and remanded in part, affirmed in part by published opinion. Judge PHILLIPS wrote the majority opinion in which Judge WILLIAMS joined. Judge WIDENER wrote a concurring in part and dissenting in part opinion.

## OPINION

PHILLIPS, Circuit Judge:

William Dionne, a former Baltimore City employee, appeals the district court's dismissal by summary judgment of his claims under 42 U.S.C. § 1983. Dionne alleged that the City and his immediate supervisor violated his procedural due process rights in two instances: first, by firing him without pre-termination notice and hearing, and second, by then reinstating him to a position that was immediately abolished by the City. Because we conclude that, under the federal common law of claim preclusion, an unreviewed state administrative decision which had found in favor of Dionne on his substantive claim of illegal termination does not preclude his subsequent § 1983 claim challenging the denial of federal procedural due process in the course of that termination, we vacate that part of the district court's grant of summary judgment which dismissed the § 1983 claim and remand it for further proceedings. Because we conclude, however, that Dionne had no protectible property interest in the continued existence of the job position to which he was reinstated, we affirm the dismissal by summary judgment of his § 1983 claim based upon its abolishment.

I

In 1985, the City of Baltimore hired William Dionne as Chief of Media Technical Services in the Mayor's Office of Cable and Communications ("MOCC"). Joyce Jefferson–Daniels ("Daniels") became MOCC Director in 1990. Daniels was Dionne's supervisor during all events relevant to this appeal, those events being (1) that Dionne was fired on October 11, 1990, and later reinstated on May 30, 1991, and (2) that as the result of a budgetary process which began in August of 1990, the job position held by Dionne and to which he was reinstated was abolished as of July 1, 1991. Because these events form the basis of Dionne's claims, we describe them in some detail.

On October 11, 1990, Daniels sent Dionne a letter terminating his employment effective that same day for allegedly violating Baltimore City Service Commission Rule 56.[1] Dionne's status as a civil service employee entitled him to the protection of the rules and regulations of the Baltimore Civil Service Commission (the "Commission"). He received, however, none of the pre-termination process specified by the Commission's rules—no oral or written notice of the specific violations alleged, nor a formal or informal pre-termination conference affording him an opportunity to respond to Daniels' charges. Dionne submitted a written request for an investigation within five days of his discharge in accordance with the Disciplinary Hearing

---

1. The Baltimore City Service Commission is an administrative body created by the Baltimore City Charter. Among other things, the Commission promulgates rules governing the employment, discipline, termination, and lay-off of employees with civil service status, and oversees compliance with those rules.

Rule 56, section (2)(*o*) provides that an employee may be discharged if he "has engaged in fraud, theft, misrepresentation of work performance, misappropriation of funds, unauthorized use of City property, obstruction of funds, unauthorized use of City property, obstruction of an official investigation or any other act of dishonesty." Baltimore City Civil Serv. Comm'n Rule 56(2)(*o*).

Regulations issued by the Commission. After several days of hearings at which both parties were represented by counsel, the Hearing Officer determined that the City had violated Dionne's procedural due process rights as detailed by the Civil Service rules, and had failed to prove the substantive allegations made against Dionne. The Officer recommended that Dionne be reinstated to his former position and receive full back pay and lost benefits; the Commission adopted his recommendations as its final decision on April 16, 1991. Commission regulations provided that the City had thirty days to appeal the decision.

Upon expiration of the thirty-day period, Dionne wrote the Commission urging it to make sure the City complied with its ruling. The City took no action, however, and on May 24, 1991, Dionne filed a complaint in the Circuit Court for Baltimore City seeking a Writ of Mandamus ordering the City and Daniels to comply with the Commission's ruling.

Daniels was served with the summons and complaint on May 29, 1991. Later that same day, she sent Dionne a letter notifying him that he would be reinstated as of May 30, 1991, and would receive his back pay and lost benefits.[2] Daniels' letter continued, "You are also advised that unfortunately ... your position has been abolished for fiscal year 1991–1992. The funding for your position expires on June 30, 1991." Dionne asserts this was the first time he heard that his position would be abolished. His last day of work was June 14, 1991.[3]

The process leading to the abolishment of his position actually began about one year earlier. In response to an August 1990 directive concerning budgetary constraints in the upcoming 1991–1992 fiscal year, Daniels recommended to the Director of Finance that

two positions in her agency be abolished—Dionne's position and a vacant contractual position.[4] On April 17, 1991, the Department of Finance submitted a preliminary budget to the Baltimore Board of Estimates. Based on the preliminary budget, the Board prepared a proposed budget ordinance which incorporated Daniels' recommendation to eliminate Dionne's position at the MOCC. The Board issued its final approval of the budget on June 24, 1991, and the budget was enacted upon the Mayor's signing on June 28, 1991. The final budget abolished Dionne's position.

On June 25, 1991, Dionne filed this § 1983 action against the Mayor and City Council of Baltimore[5] (collectively the "City") and against Joyce Jefferson–Daniels, in her individual and official capacities, alleging that the October 1990 termination and the June 1991 abolishment of his job violated his procedural due process rights. Dionne further claimed that the June 1991 abolishment of his job was in retaliation for asserting his right to an administrative hearing and so also violated his First Amendment rights. Claiming that the several constitutional violations alleged directly caused loss of his employment position, loss of wages, benefits and pension rights, damage to his reputation, mental distress and emotional trauma, his complaint sought damages for loss of back pay and benefits, future earnings and benefits, additional compensatory damages, punitive damages (as to defendant Daniels), costs, and attorney's fees pursuant to 42 U.S.C. § 1988 J.A. 17 (complaint).[6]

The district court dismissed all the claims by summary judgment, finding that Dionne had waived his right to bring a § 1983 claim based on the October 1990 termination under the doctrine of election of remedies, and that legislative immunity prevented a § 1983

---

2. Dionne voluntarily dismissed his complaint for Writ of Mandamus on June 17, 1991.

3. Dionne did not actually work until the last day of fiscal year 1990–1991 because of accrued credit for sick and leave days.

4. See Baker v. Mayor & City Council of Baltimore, 894 F.2d 679 (4th Cir.), cert. denied, 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990), for a description of the City's budgetary process.

5. The Mayor and City Council being sued in their official capacities, the defendant is actually the City of Baltimore. Baker, 894 F.2d at 680 n. 1.

6. Dionne also alleged pendent state-law claims for "wrongful discharge" and "intentional infliction of emotional distress" in connection with the two incidents upon which his § 1983 claims were based.

claim based on the allegations of retaliation. To the extent his § 1983 claim based on the June 1991 job abolishment asserted a violation of his procedural due process rights, the court held that Dionne had not stated a cognizable claim because he "enjoyed no property right in the continued existence of his job." *Dionne v. Mayor & City Council of Baltimore,* No. 91–1770 (D.Md. Jan. 13, 1992).[7]

This appeal followed.

We review in turn whether Dionne's termination in October 1990 and the abolishment of his job in June of 1991 are actionable under § 1983. We do not consider any claim under § 1983 of retaliation by the defendants in violation of Dionne's First Amendment rights as counsel for Dionne conceded that issue before this court.[8]

## II

The district court concluded that because of Dionne's earlier prosecution of his state administrative claims, the City and Daniels could not be held liable for the alleged constitutional violation under § 1983. "In successfully pursuing the Commission's post-termination administrative remedies, ... Dionne effectively waived his opportunity to seek additional damages from the Defendants." *Dionne v. Mayor & City Council of Baltimore,* No. 91–1770, 1992 WL 373149 (D.Md. Oct. 8, 1992). In its Reconsideration Opinion, the lower court revealed that it believed the doctrine of election of remedies required this conclusion.

We hold, initially, that the issue presented is not properly addressed as one of election of remedies, but as one of res judica-

ta. The Ninth Circuit, sitting en banc, recently so held, *see Haphey v. Linn County,* 953 F.2d 549, 552 (9th Cir.1992) (en banc), and we agree with that court's analysis. The distinction is one of substance. The doctrine of election of remedies "refers to situations where an individual pursues remedies that are legally or factually inconsistent." *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 49, 94 S.Ct. 1011, 1020, 39 L.Ed.2d 147 (1974); *cf.* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4476, at 773 (1981) ("[T]he election label has traditionally been used to explain decisions that today seem better explained in terms of claim preclusion."). Dionne's claim involves no such inconsistencies. The prevention of double recovery, another justification for the doctrine, *Alexander,* 415 U.S. at 51 n. 14, 94 S.Ct. at 1021 n. 14, also does not support its application. The back pay and lost benefits awarded Dionne by the Civil Service Commission would reduce any damages that Dionne might recover in this action.

We therefore address the dispositive issue as one of claim preclusion: whether the unreviewed state [9] administrative proceeding precludes a subsequent § 1983 claim which concededly arises out of the same transaction or series of transactions. Neither the Supreme Court nor this court has previously addressed the general question. The Eleventh Circuit recently has done so, holding that under federal common law, an unreviewed state agency decision should not have claim preclusive effect in a later "same transaction" § 1983 suit. *Gjellum v. City of Birmingham,* 829 F.2d 1056, 1070 (11th Cir.1987).[10] We agree with the Eleventh Circuit's deci-

---

7. Though the judgment in terms dismissed all the claims, the court's decision made no specific mention of the pendent state law claims nor the basis for their dismissal. *See* Part IV.

8. Though in literal terms the concession in colloquy with the court ran only to the claim against the City, we construe it in context as running also to the First Amendment claim against Daniels. In view of the concession, we need not address the issue of legislative immunity upon which the district court based its dismissal of this particular claim, and reserve it for another day.

9. For purposes of this appeal, it makes no difference whether the agency was that of a city or state.

10. *See also Frazier v. King,* 873 F.2d 820 (5th Cir.), *cert. denied sub nom. Davoli v. Frazier,* 493 U.S. 977, 110 S.Ct. 502, 107 L.Ed.2d 504 (1989). The Fifth Circuit determined that under either federal or state rules of claim preclusion, a prior decision by the Louisiana Civil Service Commission, ordering the plaintiff-employee reinstated with back pay, did not preclude the plaintiff's § 1983 claim in federal court. The court declined, however, to reach the issue whether state or federal rules of preclusion controlled.

sion in that case, and, as did that court, hold that under federal common-law preclusion principles, the unreviewed state administrative agency decision at issue here does not have claim preclusive effect in a subsequent § 1983 suit even though the later suit arises out of the same transaction or series of transactions.

■■■ The Full Faith and Credit Statute, 28 U.S.C. § 1738, obligates federal courts to apply state preclusion rules to determine whether a prior state court judgment has either issue or claim preclusive effect in a § 1983 action. *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (issue preclusion); *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 85, 104 S.Ct. 892, 898, 79 L.Ed.2d 56 (1984) (claim preclusion). Section 1738, however, covers only prior judgments of state *courts;* it does not apply to prior state administrative decisions that have not been judicially reviewed by state courts. *University of Tenn. v. Elliott*, 478 U.S. 788, 794, 106 S.Ct. 3220, 3223–24, 92 L.Ed.2d 635 (1986). Instead, federal common law determines what, if any, claim preclusive effect is to be accorded unreviewed state administrative decisions in subsequent § 1983 actions. *Id.* at 794, 106 S.Ct. at 3223–24; *see also Davenport v. North Carolina Dep't of Transp.*, 3 F.3d 89, 93 n. 4 (4th Cir.1993).

*University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635, addressed a related question—whether an unreviewed state agency's factfindings are entitled to *issue* preclusive effect in a subsequent § 1983 suit. In that decision, the Court noted that although § 1738 was not controlling, "because § 1738 antedates the development of administrative agencies it clearly does not represent a congressional determination that the decisions of state administrative agencies should not be given preclusive effect." *Id.* at 795, 106 S.Ct. at 3224. " 'Moreover, the legislative history of § 1983 does not in any clear way suggest

that Congress intended to repeal or restrict the traditional doctrines of preclusion.' " *Id.* at 797, 106 S.Ct. at 3225 (quoting *Allen,* 449 U.S. at 98, 101 S.Ct. at 417). Nor, according to *Elliott,* is there any indication that Congress did not intend for these traditional principles to be extended to later developments such as administrative agencies. *Id.*[11] *See also Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 107, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991) ("We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality."). The Court then held that the traditional principles of issue preclusion required federal courts to give a state administrative agency's factfinding the same issue preclusive effect it would receive in the state's own courts. *Elliott,* 478 U.S. at 799, 106 S.Ct. at 3226. This raises the question whether traditional preclusion principles require a similar rule for claim preclusion.

■ *Elliott* identified as a principal concern of issue preclusion (or collateral estoppel) that of enforcing repose, which includes both the idea of "avoiding the cost and vexation of repetitive litigation" and "conserving judicial resources," and concluded that a rule of issue preclusion furthered both policies. *Id.* at 798–99, 106 S.Ct. at 3226–27. The Court then observed that the principles embodied by the Full Faith and Credit Clause— serving the value of federalism and "act[ing] as a nationally unifying force" by preventing conflicting results—supported a federal rule requiring federal courts to apply state issue preclusion law to determine the preclusive effect of an unreviewed agency decision. *Id.* (quoting *Thomas v. Washington Gas Light Co.,* 448 U.S. 261, 289, 100 S.Ct. 2647, 2665, 65 L.Ed.2d 757 (1980) (White, J., concurring in judgment)). As did the *Elliott* Court, we therefore inquire whether a rule of claim preclusion would be consistent with the tradi-

---

11. The *Restatement (Second) of Judgments'* position is consistent with *Elliott:* If the administrative adjudication has the essential elements of an adjudication, and preclusion is consistent with the scheme of remedies, then
> a valid and final adjudicative determination by an administrative tribunal has the same effects

under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court.
*Restatement (Second) of Judgments* § 83(1) (1982).

tional principles of res judicata and with the policies underlying the Full Faith and Credit Clause.

Many of the traditional principles of claim preclusion are the same as those of issue preclusion. Both doctrines "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen,* 449 U.S. at 94, 101 S.Ct. at 415 (citing *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979)). But claim preclusion is the much more drastic doctrine, for it achieves these goals by forcing a plaintiff to raise all possible theories of recovery and to demand all desired remedies in one proceeding at peril of losing all not raised in it. 18 Wright, Miller & Cooper, *supra,* § 4408, at 65.

■ Precisely because of this drastic consequence, a critical predicate for applying claim preclusion is that the claimant shall have had a fair opportunity to advance all its "same transaction" claims in a single unitary proceeding. *Restatement (Second) of Judgments* § 26 cmt. c; *see also* 18 Wright, Miller & Cooper, *supra,* § 4412, at 93–94 ("It is clear enough that a litigant should not be penalized for failing to seek unified disposition of matters that could not have been combined in a single proceeding...."). While a state can of course provide as wide a scope as it desires for matters that can be determined in particular administrative proceedings, thereby insuring a corresponding claim preclusion scope for its adjudications, *see Restatement (Second) of Judgments* § 83(1); *see also Astoria Fed. Sav. & Loan Ass'n,* 501 U.S. at 106–08, 111 S.Ct. at 2169, the administrative proceeding at issue here was one of quite limited substantive and remedial scope. There was no way that Dionne (or any comparably situated claimant) could have advanced in the state administrative proceeding the specific constitutional theories asserted and the remedies sought in his later § 1983 action. These remedies included, as earlier indicated, not only back pay and benefits but compensatory damages for lost future earnings and benefits and for emotional distress caused by the alleged con-

stitutional violation, as well as punitive damages and attorney fees pursuant to 42 U.S.C. § 1988. *See Carey v. Piphus,* 435 U.S. 247, 257 n. 11, 263–64, 98 S.Ct. 1042, 1049 n. 11, 1052–53, 55 L.Ed.2d 252 (1978) (such damages recoverable in appropriate § 1983 case claiming violation of procedural due process); *Burt v. Abel,* 585 F.2d 613, 616 (4th Cir.1978) (damages for emotional distress recoverable in § 1983 case claiming procedural due process violation.) The administrative proceeding was limited to determining whether there was "just cause," as asserted by the public employer, for the discharge, J.A. 183–186 (Baltimore City Civil Serv. Comm'n Personnel Manual), and to the award only of reinstatement and back pay. *Id.* at 188 (same). Under these circumstances, ordinary claim preclusion principles would not prevent the later assertion of a same transaction § 1983 claim (or any other beyond the competence of the administrative agency) following the agency determination. *See Restatement (Second) of Judgments,* § 26(1)(c) (claim preclusion inapplicable where plaintiff "unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the [administrative tribunal]").

Nor would the state court system have provided an alternative forum in which all the theories and remedies sought in the two successive actions could have been fairly prosecuted in a regular civil action. Several barriers to their unitary adjudication in such a forum would have existed. The § 1983 claim, of course, could have been brought in a state court, free of any administrative exhaustion requirement, *see Felder v. Casey,* 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), but had an attempt been made to join with it a claim of discharge in violation of state law (the subject of the administrative grievance proceeding) it presumably would have been dismissed for failure to exhaust the exclusive administrative remedy provided by the state. *See Maryland Comm'n on Human Relations v. Baltimore Gas & Elec. Co.,* 296 Md. 46, 459 A.2d 205 (1983). And had the § 1983 claim (which could conceivably, but not necessarily, have provided all the relief available in the state's administrative proceeding) then failed, it is practically

certain that by then the state administrative proceeding would have been barred by the very short, five-day, limitation period for its commencement. J.A. 200, 201. Baltimore City Civil Serv. Comm'n Rules 55, 57.

Under these circumstances, a critical predicate for claim preclusion under general claim preclusion principles—that the jurisdiction whose prior adjudication is asserted as preclusive shall have provided at least one forum for the unitary adjudication of all the theories of recovery and remedies at issue—is not present. *Cf. Davenport v. North Carolina Dep't of Transp.*, 3 F.3d 89 (4th Cir. 1993) (comparable analysis of claim preclusion principles' application to successive administrative proceeding and § 1983 action under North Carolina law, where administrative proceeding had been judicially reviewed). This, therefore, also argues directly against applying claim preclusion here as a matter of federal common law.

Next, neither private party costs nor the burden of the federal courts would be eased by a rule of claim preclusion. Because plaintiffs might well choose to bypass the administrative agency and go directly to federal or state court with a § 1983 claim rather than forfeit the right to pursue that claim, the cost of litigation and the burden on the federal court system could well rise, instead of fall, if claim preclusion applied. Plaintiffs would be discouraged from pursuing the generally cheaper and more efficient route of seeking an administrative remedy in order to preserve their federal rights. *See Frazier v. King*, 873 F.2d 820, 824 (5th Cir.1989) (a rule of claim preclusion "would encourage plaintiffs to bypass administrative proceedings in order to preserve their claims under § 1983"); *see also* 18 Wright, Miller & Cooper, *supra*, § 4412, at 93. The odds, therefore, are against either a reduction of private party costs or a conservation of federal judicial resources by applying claim preclusion. *See Gjellum*, 829 F.2d at 1069 ("[J]udicial economy in general is not furthered by precluding litigation of issues not previously adjudicated ... '[W]e fail to understand how any such interests justify the adoption of a rule that would bar the assertion of constitutional claims which have never been litigated.'") (quoting *Haring v. Prosise*, 462 U.S. 306, 322 n. 11, 103 S.Ct. 2368, 2377 n. 11, 76 L.Ed.2d 595 (1983)).

Finally, nothing in the legislative history of § 1983 suggests that state administrative proceedings should in these circumstances be afforded claim preclusive effect. Although, as the *Elliott* court observed, the enactment of the civil rights statutes predates the development of administrative agencies, the court also found "no reason to suppose that Congress ... wished to foreclose the adaptation of traditional principles of preclusion to ... administrative adjudication[s]." 478 U.S. at 797, 106 S.Ct. at 3225. Further, by enacting § 1983, Congress intended to expand the jurisdiction of the federal courts, not subtract from that of the states. *Allen*, 449 U.S. at 99, 101 S.Ct. at 417; *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 481, 5 L.Ed.2d 492 (1961). Finally, it must be kept in mind that § 1983 was enacted to provide individuals access to a federal forum for the protection of their federal rights. *Id.* at 180, 81 S.Ct. at 480; *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972). There is no support in § 1983's legislative history for a conclusion that, contrary to traditional claim preclusion principles, an adjudication in a state administrative tribunal of limited jurisdiction should preclude a later § 1983 action in federal court.

There is also no justification for a rule requiring federal courts to apply *state* claim preclusion law to determine the preclusive effect of the unreviewed agency decision. The policies underlying the Full Faith and Credit Clause, identified in *Elliott*, would not be served by such a rule.[12] We discern no appreciable risk of inconsistent decisions if agency decisions do not have claim preclusive effect in § 1983 actions. Under *Elliott*, state issue preclusion rules may prevent the relit-

---

12. The principles encompassed by the Full Faith and Credit Clause and those of claim preclusion overlap to a great extent. *Elliott* recognized as "the major purpose of the Full Faith and Credit Clause ... to act as a nationally unifying force." 478 U.S. at 799, 106 S.Ct. at 3226 (internal quotations omitted). The prevention of inconsistent results often is cited as one purpose of claim preclusion. *See* 18 Wright, Miller & Cooper, *supra*, § 4403.

igation of factual issues already determined by the administrative agency, and thus foreclose the possibility of inconsistent results. *See Gjellum*, 829 F.2d at 1069 ("declining to apply state claim preclusion rules to unreviewed agency decisions would create little risk of inconsistent state and federal adjudications given the holding in *Elliott*"). We note also that the absence of claim preclusion will not permit double recoveries. Any damages awarded under § 1983 will be reduced by the amount of any duplicative monetary relief recovered in an earlier administrative proceeding.[13]

· We therefore hold, applying federal common law preclusion principles, that the unreviewed state administrative decision at issue here has no claim preclusive effect in the subsequent § 1983 action, despite arising out of the same transaction or series of transactions. A federal rule applying claim preclusion would not be consistent with traditional claim preclusion principles. Nor would the values underlying the Full Faith and Credit Clause be served by a federal rule requiring application of state claim preclusion law.[14] Thus, the district court erred in finding that Dionne could not pursue his § 1983 cause of action based on the October 1990 termination.

### III

Dionne's challenge to the dismissal of a second claim under § 1983 based on the June 1991 abolishment of his job is without merit. He argues that by reinstating him to a job that was essentially already non-existent, his due process rights were violated. The district court properly dismissed this claim.

Dionne enjoyed no property right in the continued existence of his job and consequently his position could be abolished by the legislature without notice and a hearing. *See Goldsmith v. Mayor & City Council of Baltimore*, 845 F.2d 61, 64 (4th Cir.1988).[15]

### IV

We vacate the district court's dismissal by summary judgment of Dionne's § 1983 claim of a denial of procedural due process in connection with his termination in October 1990 and remand that claim for further proceedings. We affirm the district court's dismissal by summary judgment of Dionne's § 1983 claims of procedural due process and First Amendment violations in connection with the June 1991 job abolishment. We vacate that portion of the district court's judgment which dismissed the pendent state law claims, *see* note 7 *supra*, and remand those for reconsideration in light of this opinion.

SO ORDERED.

WIDENER, Circuit Judge, concurring in part and dissenting in part:

I concur in the body of Part III of the majority opinion, which holds that the district court's dismissal of Dionne's second section 1983 claim was proper because he did not have a property interest in the continued existence of his job. Having said that, I emphasize that I do not agree with and dissent from footnote 15 to Part III of the majority opinion. That footnote, purely *dicta*, suggests to the district court an avenue for it to find damages for violation of a cause

13. The Civil Service Commission reinstated Dionne and awarded back pay and lost benefits. In the § 1983 action, the defendants are entitled to protection against duplication of these awards.

14. Though the state rule of claim preclusion is not directly material in view of our holding that federal common law should supply the rule for this case, we observe that Maryland apparently would apply the same general rule of claim preclusion in comparable situations. *See Esslinger v. Baltimore City, Maryland*, 95 Md.App. 607, 622 A.2d 774, *cert. denied*, 331 Md. 479, 628 A.2d 1066 (1993). That being so, there could be no disincentive for an unsuccessful claimant in state administrative proceedings to seek state judicial review before resorting to a § 1983 claim in federal court. He would have benefit of the same no-claim-preclusion rule whether state or federal claim preclusion law was applied by the federal § 1983 court depending upon whether the administrative decision was or was not judicially reviewed.

15. Of course, if Dionne were to prevail on his remanded claim of a denial of procedural due process in connection with his October 1990 termination, he is free to attempt proof that any damages he suffered from the job abolishment were causally linked to the earlier violation of rights. We express no opinion on the merits of any such attempt made.

of action the majority has, in that same Part III, found to be non-existent. I doubt that the decision should go so far to justify the additional damages which are its *raison d'etre.*

I do not agree, moreover, that Dionne should not be barred from seeking additional remedies in federal district court for his initial termination. I therefore respectfully dissent from Part II of the majority opinion and, as well, from a significant part of the result.

The majority states that a state-court section 1983 claim "could conceivably, but not necessarily, have provided all the relief available in the state's administrative proceeding." Maj. op. at 683. I differ with this statement only in that I believe Dionne could certainly have received all the remedies provided at the administrative proceeding, reinstatement and backpay, in a state-court section 1983 action. See, e.g., *Maryland National Capital Park & Planning Comm'n v. Crawford,* 307 Md. 1, 511 A.2d 1079 (1986) (state section 1983 action affirming an award of compensatory damages, a mandatory injunction to transfer the plaintiff to the position which she was denied in violation of the

Equal Protection Clause, and attorneys' fees, and remanding on other grounds); *Shapiro v. Chapman,* 70 Md.App. 307, 520 A.2d 1330, 1334 (1987) (finding that "the elements of damages recoverable in an action under § 1983 [for an unprovoked assault] are identical to those recoverable in a common law action" with the exception of the attorneys' fees available to prevailing parties under § 1988). It is on this basis that I believe that Dionne elected his remedies, and thus that he should be denied further recovery in federal court.

I believe that the doctrine of election of remedies should be invoked to avoid just such scenarios as the present litigation presents.[1] Mr. Dionne, upon being terminated from his employ, was immediately faced with three choices: (1) he could have brought an administrative grievance within five days to regain his job and collect lost wages; (2) he could have sued in state court under section 1983, regained his job, gotten additional prospective injunctive relief, and recovered lost wages, compensatory and punitive damages, and attorneys' fees; (3) he could have sued in federal court under section 1983 and recov-

---

1. The several variations on the doctrine of election of remedies were analyzed by the Ninth Circuit in *Oubichon v. North American Rockwell Corp.,* 482 F.2d 569, 572–74 (9th Cir.1973) (cited with approval in *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 49 n. 11, 51, 94 S.Ct. 1011, 1020 n. 11, 1021, 39 L.Ed.2d 147 (1974)), in the context of Title VII claims following arbitration based on nondiscrimination clauses in collective-bargaining agreements. That court described the traditional doctrine as applying " 'only where conflicting and inconsistent remedies are sought on the basis of conflicting and inconsistent rights.' " *Oubichon,* 482 F.2d at 572 (quoting *Newman v. Avco Corp.,* 451 F.2d 743, 746 n. 1 (6th Cir.1971)). The court went on to identify additional concerns identified by modern courts under the doctrine, including the possibility of double recovery, the unfairness of allowing claimant-employees to overturn or augment the disposition of prior proceedings but not defendant-companies, and the unfairness of requiring a defendant-company to defend itself in two fora. In the context of that case, governed by Title VII, the Ninth Circuit was able to dispose of all of these concerns and thus to reject the election-of-remedies defense to a claim for supplemental Title VII remedies following arbitration of an

alleged breach of the nondiscrimination clause of a collective-bargaining agreement.

In the context of a section 1983 action following a state administrative wrongful-termination decision, these modern election-of-remedies concerns cannot be disregarded. Although the majority circumscribes its opinion to ensure against a double recovery in this case, see maj. op. at 684–85 & n. 13, it does not address the piecemeal nature of the litigation or the unfairness to defendants, which are undeniable. Moreover, it is not relevant in this case whether Congress enacted section 1983 "at least in part, because [state administrative and judicial remedies] had proved inadequate to protect employees from [wrongful termination]," 482 F.2d at 573, as the *Oubichon* court found with respect to arbitration in the Title VII context. It was this finding, that Congress believed nondiscrimination-clause arbitration to be inherently inadequate to protect employees' right against discrimination in the workplace, that made the unfairness to defendants and the additional burdens on the judicial system not only appropriate but calculated in that context. See *Oubichon,* 482 F.2d at 573–74. Here, by contrast, the State of Maryland provides a forum which gives the full measure of relief available to Dionne in federal court, and he simply chose not to take advantage of it.

ered precisely what he could have recovered in state court.[2]

Although it is true that the section 1983 claim cannot be considered in the state administrative proceeding because of the limited jurisdiction of the Civil Service Commission, and that the statute of limitations provided for such actions is very short, all of which might have the effect of forcing aggrieved employees to bypass the administrative proceeding in favor of full recovery in federal or state court, this should be of no consequence.[3] In fact, it presents all the more reason to find that the Commission's determination precludes a federal section 1983 action, because this would provide the States with incentive not to create limited administrative proceedings that result in multiple adjudication and unnecessary harassment of defendants such as the Baltimore officials in this case. See *supra* note 3.

**2.** As the majority notes, see maj. op. at 684–85 & n. 14, Dionne would probably but not necessarily be permitted to bring suit for additional remedies in the Maryland state courts after following the administrative procedure. See *Esslinger v. Baltimore City*, 622 A.2d 774, 782–83 (Md.Ct.App.), *cert. denied*, 331 Md. 479, 628 A.2d 1066 (1993). *Esslinger* dealt with the claimant's inability to recover any damages at all, in either a Zoning Board hearing on his application for permission to build a satellite dish or the appeal to a Maryland Circuit Court from that hearing, for violations of his federal constitutional and statutory rights. Obviously, unlike Dionne, Esslinger had no choice but to commence his claim by approach to the Zoning Board, because the Zoning Board had exclusive authority to grant or deny his application. Moreover, under the administrative procedures involved in adjudicating zoning applications, Esslinger was denied any monetary recovery for violations of his rights, unlike Dionne who recovered substantially what he was owed, backpay and reinstatement, in his appeal to the Civil Service Commission.

Thus, I am not certain that the Maryland courts would find Dionne's situation analogous to Esslinger's and therefore deny preclusive effect to Dionne's administrative award. In any event, even if the State of Maryland would not preclude Dionne's resort to state court to augment his administrative recovery, the Maryland courts cannot create jurisdiction in the federal courts where it does not otherwise exist. Thus, the fact that the State of Maryland might permit the inefficiency and burden of such piecemeal litigation cannot control our decision whether to do the same.

The majority apparently finds it significant that Dionne could not have recovered on theories of both federal due process and state wrongful termination in the state-court proceeding, because the state court would have dismissed the latter claim for failure to exhaust administrative remedies. See maj. op. at 683. I note that it is not at all clear that a Maryland court would be required to dismiss such claims for failure to exhaust, since "[i]t is now clearly established that a plaintiff suing under 42 U.S.C. § 1983 ... need not exhaust his administrative remedies prior to bringing his § 1983 action," *Esslinger*, 622 A.2d at 778, and there is no evidence in the record that the Civil Service Commission procedures are exclusive. In any event, I find this quite irrelevant since Dionne is doubtless indifferent as to what theory he recovers on, as long as he recovers all that he is owed. See *Shapiro*, 70 Md.App. 307, 520 A.2d 1330, 1334 (1987) (stating that appel-

**3.** As the majority states, "a state can of course provide as wide a scope as it desires for matters that can be determined in particular administrative proceedings." Maj. op. at 683. Whether the State has done so in a manner that would repel potential claimants is within that State's discretion, but the federal courts should not be compelled by any shortcoming of state administrative procedures to hear piecemeal cases that could have been decided more efficiently and cohesively in one proceeding had the plaintiff chosen to do so. This is all the more apparent in the case where, as here, the State has provided an alternate forum, the state courts, for recovering all that Dionne was owed.

The majority expresses concern that precluding section 1983 litigation following state administrative determinations might result in additional costs and burdens on the federal courts, because litigants might be motivated to avoid the administrative proceeding in favor of state or federal court. See maj. op. at 684. I note that it will have the same effect on state courts, which should cause States to rethink and expand the jurisdiction of their administrative agencies in order to avoid these problems. Regardless of the effect the federal courts choose to give to them, limited administrative decisions will invariably result in unnecessary burdens, whether on litigants in the form of multiple adjudications and piecemeal litigation or on the state and federal courts because the administrative proceeding will be bypassed as unhelpful. In the light of this, I see no reason not to provide an incentive for the States to structure their administrative proceedings efficiently, rather than to condone any inefficiency of such proceedings by allowing the federal courts to be used to augment them.

lants in that case "would not have been able to recover twice for the same tort merely because the wrong gave rise to alternative theories of recovery," if a prior recovery had awarded all the remedy that a latter recovery would have provided). The state court section 1983 claim would undoubtedly have allowed him to do just that, whether the wrongful-termination theory could be joined or not.

Effectively, what Dionne has done here is to choose from among several options, any one of which would have satisfactorily provided him with restitution for his injury (although some admittedly better than others), that which might most quickly and inexpensively afford him some amount of recompense. If his administrative grievance was unsuccessful, he would lose nothing, for he could simply bring a claim in state or federal court; as the majority argues, the Commission's determination apparently would not be given claim-preclusive effect in either forum. But see *supra* note 2. If he was successful in the administrative proceeding, however, as was the case here, he could then come into federal court wielding the sword of issue preclusion against the defendants, see *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 190 (4th Cir.1994), to summarily recover all the additional damages available in the federal forum.

Quite simply, I do not believe that this is the sort of purpose for which the federal judiciary should be used. It is not, and could not be, claimed that the State of Maryland provides an inadequate forum or remedy for the injury suffered by Dionne, as was the case in the Title VII cases relied on by the Supreme Court in *Alexander v. Gardner-Denver*, 415 U.S. at 49 & n. 11, 94 S.Ct. at 1020 & n. 11 (finding neither preclusion of a federal Title VII claim nor election of remedies on the basis of an arbitration proceeding to enforce the nondiscrimination clause in a collective-bargaining agreement). Thus, it is neither necessary nor helpful to allow litigants to pursue the course followed by Dionne in this case. See *supra* note 3. Moreover, the piecemeal nature of such litigation, the unnecessary delay in reaching final adjudication of all claims and theories, and the

harassment of defendants that will result from multiple proceedings are more than sufficient basis to deny additional recovery in the federal courts in such cases.

I agree with the Ninth Circuit panel in *Haphey v. Linn County* that Dionne "chose to pursue a remedy through the administrative process when ... [he] could have brought an action directly in federal court under section 1983," 924 F.2d 1512, 1519 (9th Cir.1991), *vacated in part and remanded en banc on this point by* 953 F.2d 549 (9th Cir.1992), and thus, especially since he also had a complete remedy under section 1983 in state court, that he elected a remedy from among inconsistent available remedies and his relief should be limited accordingly.

I would therefore affirm the judgment of the district court granting summary judgment to appellees.